# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2017-KA-01214-COA

**DELBERT KEYES A/K/A DELBERT KEYS JR.**                    **APPELLANT**
**A/K/A DELTBER KEYES JR.**

**v.**

**STATE OF MISSISSIPPI**                                        **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 02/23/2017 |
| TRIAL JUDGE: | HON. ROGER T. CLARK |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT, FIRST JUDICIAL DISTRICT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: W. DANIEL HINCHCLIFF |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: JOSEPH SCOTT HEMLEBEN |
| DISTRICT ATTORNEY: | JOEL SMITH |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 12/04/2018 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

### BEFORE GRIFFIS, P.J., BARNES AND CARLTON, JJ.

### BARNES, J., FOR THE COURT:

¶1.     Delbert Keyes was convicted of robbery, kidnapping, and forcible sexual intercourse. For each count, he was sentenced to life without eligibility for parole in the custody of the Mississippi Department of Corrections (MDOC) as a habitual offender under Mississippi Code Annotated section 99-19-83 (Rev. 2015), with the sentences to run consecutively. He appeals his convictions, asserting several allegations of error involving the weight and sufficiency of the evidence and his status as a habitual offender. We find no error and affirm.

### SUMMARY OF FACTS AND PROCEDURAL HISTORY

¶2. During the late evening of October 18, 2015, seventy-seven year old Liza[1] was at home in Gulfport, Mississippi, when her dog began barking at something outside; so she went to investigate. A man came up behind her and "clamped" her arm, twisting it behind her back. He forced her inside to her bedroom where he tied her arms behind her back with handkerchiefs and forced her to lie face down with a pillow over her head. The man demanded money. Upset after discovering only $60 in Liza's purse, the assailant took off Liza's nightgown and attempted to penetrate her with his penis, using a handkerchief to cover it. While he was attempting to have intercourse with Liza, he took off his leather jacket. When he finished with his assault, he began looking for jewelry. Liza told him there was an additional $100 hidden in her purse, which he took. The attacker exited the home, leaving behind his jacket, which Liza had kicked under the bed. Liza ran to her neighbors' home to contact the police. She described the man as short and heavyset. Liza was taken to the hospital for an examination, and the perpetrator's jacket, Liza's nightgown, and her handkerchiefs were sent for DNA analysis.

¶3. A few days later, Leonard Bankston, a local handyman who had worked for Liza, heard of the assault and reported to the police that he suspected his neighbor, Keyes, was the perpetrator. Following up on Bankston's tip, Detective Christopher Werner located Keyes at his sister's apartment. The detective noted that Keyes was a "[s]horter, heavier set individual," matching Liza's description of her assailant. Detective Werner confiscated a cell

---

[1] To protect the identity of the victim, we will refer to her by a fictitious name.

phone lying next to Keyes on the couch. Although Keyes denied it was his phone, it was later confirmed that Keyes bought the phone the day after Liza's assault. Examination also revealed that the phone was used to search for news regarding the attack and for information on bus tickets. Police also talked with Keyes's sister, Debbie Faulkner, who said that on the evening of the attack, her brother had left her home at 10:30 p.m. and returned at 1:30 a.m. without his jacket. Faulkner's home was only a couple of blocks from Liza's house. Faulkner identified the recovered jacket as Keyes's. However, when interviewed by police, Keyes claimed that he never left his sister's apartment that evening and had gone to bed by 9:00 p.m. Police took Keyes into custody and collected DNA through a buccal swab.

¶4. On May 23, 2016, Keyes was indicted for Count I, robbery; Count II, kidnapping; and Count III, forcible sexual intercourse, as a habitual offender under Mississippi Code Annotated section 99-19-81 (Rev. 2015). The State filed a motion to amend the indictment to charge Keyes under section 99-19-83 on November 30, 2016. The trial court granted the motion.

¶5. A jury trial was held in Harrison County Circuit Court on February 21-23, 2017. Liza testified regarding the events that occurred during the attack as stated above. Gulfport Police Officer Jason Vincent testified about his investigation of the crime scene. He observed jewelry on top of the bed and a "black leather coat underneath the bed with two handkerchiefs near it." He also observed another handkerchief tied in a knot with hair in it, and the condition of the room indicated "somebody was rummaging, attempting to locate

items."

¶6.    Tobie Nix, the emergency-room nurse who treated Liza on the night of the attack, stated that Liza had "multiple bruising to her upper body, her wrist, her neck, face, some abrasions that were current." The witness did acknowledge that some of the bruising reportedly occurred prior to the attack. Dr. Kathy Keimig, the treating emergency-room physician, was admitted as an expert in the field of emergency-room medicine. She noted that Liza was "very upset, tearful, [and] was very anxious." During her examination, Dr. Keimig noted fresh bruising and abrasions around Liza's face, arms, and wrists. She also testified that Liza had bruising and abrasions around and inside her genital area and rectum, which were consistent with a sexual assault.

¶7.    Bankston said that he knew Keyes and had driven him to the store or to the scrap yard on occasion. On cross-examination, counsel asked him why he thought Keyes had perpetrated the attack on Liza. Bankston said he did his own investigating when he heard of the assault and "did enough searching to know that [Keyes] had done this same particular thing [twenty] years ago." Defense counsel objected and moved to strike the response. The trial judge said that the witness was merely responding to the defense's question; so the testimony was allowed.

¶8.    Kathryn Rogers, a DNA analyst with Scales Biological Laboratory, testified as an expert in the field of DNA analysis. She took samples from the leather jacket to create a mixture profile. The DNA analysis revealed that 99.99% of the world's population could be

4

excluded from the mixture profile, but Keyes could not. Additionally, Rogers conducted Y-chromosome testing of the handkerchief. While 99.93% of the male population could be excluded, Keyes could not.

¶9. The State rested, and the defense moved for a directed verdict, which the trial judge denied. Keyes testified, claiming that on the day of the assault, he had been watching football all day. He admitted that he left home about 10:15 p.m. but claimed he went to a trailer park a few blocks away and drank with some acquaintances around a "pit." Keyes said he took off his jacket and accidentally left it on a chair. When he got to his sister's apartment, he realized he left the jacket and went back, but no one was there. He denied telling police he had been home all evening.

¶10. The jury found Keyes guilty on all three counts, and the trial judge sentenced him as a habitual offender under section 99-19-83 to life without eligibility for parole in the custody of the MDOC for each count, with the sentences to run consecutively. Keyes filed a motion for a new trial, which the trial court denied.

¶11. On appeal, appointed appellate counsel for Keyes argues that the trial court erred in denying his motion for a new trial as the verdict is against the overwhelming weight of the evidence. Counsel also argues that Bankston's reference to Keyes's prior convictions during cross-examination warranted a mistrial, or at the very least, an admonishment to the jury by the trial judge to disregard the statement. Not wholly satisfied with the issues of error brought by appellate counsel, Keyes requested to file a supplemental pro se brief, which this

Court granted. In his supplemental brief, Keyes additionally asserts: (1) that he should not have been sentenced under section 99-19-83 because the State failed to demonstrate that he had two prior convictions for which he served one year or more in custody; (2) that the evidence was insufficient to support his conviction for kidnapping; and (3) that the trial court exceeded its authority in sentencing him to life without parole for rape. We will address each of these assignments of error in turn.

## DISCUSSION

I.    **Whether the verdict was against the overwhelming weight of the evidence.**

¶12.    Keyes argues that his convictions were based on scant circumstantial evidence, noting the only evidence connecting him to the crime was the jacket, which he claims he lost that night. Therefore, he contends that the verdict was against the weight of the evidence. When reviewing a challenge to the weight of the evidence, we consider "the evidence in the light most favorable to the verdict," and we will not reverse unless the "verdict . . . is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Little v. State*, 233 So. 3d 288, 292 (¶21) (Miss. 2017). "[W]hen the evidence is conflicting, the jury will be the sole judge of the credibility of witnesses and the weight and worth of their testimony." *Id*. at (¶20) (quoting *Gathright v. State*, 380 So. 2d 1276, 1278 (Miss. 1980)).

¶13.    We find there was ample evidence in favor of Keyes's guilt. Keyes's sister testified that he left her house wearing his leather jacket around the time of the attack, and he returned

a few hours later without it. She identified the jacket recovered from Liza's home as Keyes's, and he acknowledged that the jacket found at the scene was his. He matched Liza's physical description of the assailant. A forensic examination of Keyes's cell phone showed that it was purchased the day after the crime and that he had accessed several news stories about the attack and searched for bus tickets out of town. DNA evidence was recovered from the jacket and handkerchiefs and compared to Keyes's DNA sample. While over ninety-nine percent of the world's population could be excluded, Keyes could not be ruled out as the source of the DNA recovered from the scene. Viewing the evidence in the light most favorable to the verdict, we do not find that allowing the verdict to stand would sanction an unconscionable injustice.

## II. Whether Bankston's remarks about Keyes's prior convictions warranted a mistrial.

¶14. Keyes filed a motion in limine under Mississippi Rules of Evidence 404 and 609 to prohibit any reference by the State regarding his prior convictions. The State indicated that it had no intention of discussing the prior convictions "unless for some reason the [d]efense opens the door." During the defense's cross-examination of Bankston, the following exchange took place:

> [Defense]. Okay. You said that you did your own investigating after you saw the news report?
>
> [Witness]. Right.
>
> [Defense]. What kind of investigating did you do?

[Witness].   Well, I did enough searching to know that [Keyes] had d[one] this same particular thing 20 years ago.

[Defense].   Objection, Your Honor. I move to strike this witness'[s] response to that question based on our motions.

[Witness].   Well, you're asking me those questions.

[The Court].  You asked him the question. He's explaining it.

[Witness].   I'm just telling you the truth.

[The Court].  He's giving you an answer.

Keyes claims that Bankston's comment that Keyes had done the "same particular thing [twenty] years ago" was prejudicial and warranted a mistrial.

¶15.   However, as the trial court noted, Bankston's testimony was in direct response to a question asked during defense counsel's cross-examination. "Generally, an appellant cannot complain of damaging testimony if the testimony is in response to his questions." *Saunders v. State*, 64 So. 3d 535, 536 (¶9) (Miss. Ct. App. 2011) (quoting *Triggs v. State*, 803 So. 2d 1229, 1234 (¶14) (Miss. Ct. App. 2002)). "[A] defendant cannot complain of evidence that he himself introduces by virtue of his own questions." *Lane v. State*, 841 So. 2d 1163, 1169 (¶19) (Miss. Ct. App. 2003) (citing *Hobson v. State*, 730 So. 2d 20, 24-25 (¶15) (Miss. 1998)). "Objectionable statements are not error if they are the product of direct and cross-examinations by the defense counsel." *Id*. (citing *Fleming v. State*, 604 So. 2d 280, 289 (Miss. 1992)). Accordingly, we find no error in the trial court's decision not to strike the testimony.

¶16. Keyes also argues that the trial court erred in not admonishing the jury to disregard Bankston's statement. However, defense counsel never requested that the trial judge give such an admonition, and the trial court was under no obligation to issue a limiting instruction sua sponte. In *Moss v. State*, 977 So. 2d 1201, 1212 (¶22) (Miss. Ct. App. 2007), the defendant, Robert Moss, opened the door to his prior convictions on cross-examination. Because the defense failed to request a limiting instruction, this Court held that he was barred from bringing the issue on appeal. *Id*. at (¶25). Moreover, "[t]he trial judge was not obligated to provide a limiting instruction sua sponte regarding the admission of [the defendant's] prior convictions." *Id*. We find no merit to Keyes's claim.

### III. Whether Keyes's prior convictions supported his classification as a habitual offender under section 99-19-83.

¶17. Keyes contends he was erroneously sentenced to life under section 99-19-83, as his indictment—which listed his two prior convictions to support his habitual offender status under section 99-19-83—failed to state that he *served* one year or more in MDOC custody. He claims that no "legal documentation" was provided as to whether he served one year or more in custody.

¶18. The record does not support Keyes's claim. At the February 16, 2017 hearing on the motion to amend the indictment, the State submitted supporting documentation (a "pen pack") that included an April 13, 1988 order by the Harrison County Circuit Court stating that Keyes had pleaded guilty to manslaughter and aggravated assault and had been sentenced to serve twenty years in the custody of the MDOC for each conviction, with the sentences

9

to run concurrently. Also contained in the pen pack was Keyes's MDOC discharge certificate that stated he was released on parole on November 26, 1996, evidencing that he served one year or more in custody. There was no objection to the State's motion to amend the indictment. The pen pack was again submitted during Keyes's sentencing hearing.

¶19. Keyes further contends that he should have been sentenced in a bifurcated trial. Keyes cites no authority for his argument; so his claim is barred. M.R.A.P. 28(a)(7). Regardless, we find no error. As this Court has held: "What is intended by the bifurcated-trial requirement is 'to ensure that a jury, before deciding a defendant's guilt or innocence, is not informed of the defendant's prior criminal record so as not to be improperly influenced in its verdict.'" *Brown v. State*, 232 So. 3d 804, 811-12 (¶26) (Miss. Ct. App. 2017) (quoting *Small v. State*, 141 So. 3d 61, 66-67 (¶17) (Miss. Ct. App. 2014)). The jury was not present during the trial court's hearing on the motion to amend the indictment, and the trial judge waited until after the jury had returned its verdicts before addressing Keyes's sentencing as a habitual offender. We find this sufficient to meet the bifurcated-trial requirement.

IV. **Whether the evidence was sufficient to support the kidnapping conviction.**

¶20. Keyes argues that evidence was not sufficient to support his conviction for kidnapping as "the evidence [introduced] by the [S]tate on the kidnapping charge was relevant to the charge of rape." When reviewing a challenge to the sufficiency of the evidence, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, "any rational trier of fact could have found the essential elements of the crime beyond a

reasonable doubt." *Bush v. State*, 895 So. 2d 836, 843 (¶16) (Miss. 2005), abrogated on other grounds by *Little*, 233 So. 3d at 291-92 (¶¶16-21).

¶21. The jury was instructed that in order to find Keyes guilty of kidnapping, the jury had to find beyond a reasonable doubt that he "feloniously, willfully and without lawful authority forcibly seize[d] and confine[d] [Liza], [w]ith or without intent to cause [her] to be secretly confined or imprisoned." Keyes argues Liza was not forced to leave her property and she was not "secretly confined"; thus, the evidence does not support the kidnapping charge.

¶22. We find no merit to this claim. Liza testified that her attacker, Keyes, grabbed her and forced her back into her house. He then bound her hands with handkerchiefs and forced her to lie down on the bed. In *Haymond v. State*, 478 So. 2d 297, 299 (Miss. 1985), the Mississippi Supreme Court found that evidence showing a defendant took control of the victim's car by grabbing the steering wheel and "forcibly back[ing] it off the road" was sufficient to support the defendant's kidnapping conviction. "[T]he victim literally became a prisoner in his own vehicle. . . . At this point, the victim was forcibly detained, secretly confined[,] and imprisoned against his will." *Id*. We find Liza's testimony constituted sufficient evidence to support Keyes's conviction for kidnapping because she was a prisoner in her own home.

### V.    Whether the trial court exceeded its authority in sentencing Keyes to life without parole for rape.

¶23. Keyes argues that the trial court abused its discretion in sentencing him to life without parole for the rape conviction, absent a recommendation by the jury. Mississippi Code

11

Annotated section 97-3-65(4)(a) (Rev. 2014) provides:

> Every person who shall have forcible sexual intercourse with any person, or who shall have sexual intercourse not constituting forcible sexual intercourse or statutory rape with any person without that person's consent . . . shall be imprisoned for life . . . if the jury by its verdict so prescribes; and in cases where the jury fails to fix the penalty at life imprisonment, the court shall fix the penalty at imprisonment . . . for any term as the court, in its discretion, may determine.

The supreme court expressly rejected the concept that only a jury can sentence someone convicted of rape to life without parole in *Bester v. State*, 188 So. 3d 526, 529 (¶10) (Miss. 2016), stating that "the plain language of Section 97-3-65(4)(a)" authorizes the trial court to sentence a defendant convicted of rape to any term of imprisonment, including life. Furthermore, Keyes's prior convictions support his habitual-offender classification under section 99-19-83, leaving the trial court with no discretion to sentence Keyes to any term except life for his convictions. Therefore, this issue is without merit.

¶24. Accordingly, we affirm the trial court's judgment.

¶25. **AFFIRMED.**

**LEE, C.J., IRVING AND GRIFFIS, P.JJ., CARLTON, FAIR, WILSON, GREENLEE, WESTBROOKS AND TINDELL, JJ., CONCUR.**

12